In re Larry E. POLZIN,
and
Dale R. Polzin and Clare L.
Polzin, Debtors.

Bankruptcy Nos. 4–85–657, 4–85–656.

United States Bankruptcy Court,
D. Minnesota.

May 13, 1985.

---

Michael C. Karp, Blethen, Gage & Krause, Mankato, Minn., for debtors.

Robert Halvorson, Gislason, Dosland, Hunter & Malecki, New Ulm, Minn., for Production Credit Ass'n.

## ORDER DENYING DEBTORS' USE OF CASH COLLATERAL

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned Judge on the motion of the Debtors for use of cash collateral pursuant to 11 U.S.C. § 363.

For the reasons outlined below, I am denying Debtors' motion for use of cash collateral.

### FACTS

1. The Debtors are farmers who filed their Chapter 11 petitions in bankruptcy on April 10, 1985. The Debtors operate their farm as a partnership.

2. Debtors need money to pay the expenses of planting and raising their 1985 crops and to feed their cattle.

3. Debtors owe approximately $320,000 to the Production Credit Association of Windom, Minnesota (PCA).

4. Of the debt owed to PCA, only a portion of it is secured due to a lack of collateral value at the time of filing of the petition. The secured portion of the PCA

debt is approximately $260,000, which security is broken down as follows:

| | |
|---|---|
| 1984 grain | $54,982.00 |
| Cattle | $65,000.00 |
| Equipment | $140,602.00 |
| Total | $260,584.00 |

5. Debtors plan to sell $49,500.00 of cattle and all the 1984 grain and plan to use the equipment secured to the PCA.

6. Debtors offer as adequate protection to the PCA the following:

1. Payment to PCA of $49,500 from the cattle liquidation.

2. Payment to PCA of $15,000 of the grain liquidation.

3. Payment to PCA of $20,000 of interest.

4. Grant to PCA of a replacement lien consisting of a second mortgage on the nonexempt real estate of the Debtors (240 acres).

7. The value of the farmland upon which the proposed replacement lien would be granted is between $112,000 and $226,000 per testimony. The reasonable value of the land is approximately $150,000. The Federal Land Bank debt is $114,000, which constitutes a first lien upon the real estate.[1] Therefore, there is approximately $36,000 of equity in the nonexempt real estate at this time.

8. Farm real estate values have been declining and the Debtors' farmland will depreciate further in the future. The Debtors' farming equipment is depreciating at approximately 10 percent per year.

9. Debtors will have approximately $31,950 value in their livestock herd even after the sale of cattle as proposed above due to the birth of new calves.

---

**1.** Debtors plan to pay the Federal Land Bank $14,000 of principal and interest so that the Federal Land Bank debt will not grow at this time. The Federal Land Bank debt is a lien on 320 acres of Debtors' land. Debtors are claiming 80 acres of their land as an exempt asset under 11 U.S.C. § 522. The Federal Land Bank will be required to marshal its debt against the nonexempt portion first. Thus, the entire $14,000 lien will be treated as being against the nonexempt real estate for the purposes of this order. M.S.A. § 582.04.

## DISCUSSION

Debtors have brought this motion under 11 U.S.C. § 363(c) for use of cash collateral. Debtors need money for operating expenses during 1985. The PCA has requested adequate protection from the Debtors under 11 U.S.C. § 363(e). As stated in the facts above, Debtors plan to sell their 1984 grain and some of their cattle and use a portion of these proceeds in their farming operation. The Debtors also plan to pay to PCA and the Federal Land Bank some of the money as payments on their secured debts. The cattle sale proceeds will be paid in total to the PCA. The grain sale proceeds will *not* all be paid to PCA. Of the $54,982 of grain sale value, only $15,000 will be paid to PCA for principal reduction on its debt. Another $20,000 will be paid to PCA, as stated by Debtors' motion, as "interest" payments on its debt. The remaining $20,000 will be used to pay other creditors. The money is "cash collateral" as that term is defined under 11 U.S.C. § 363(a) since it is cash which is the "proceeds of property subject to a security interest as provided in § 552(b) of this title . . .".

Debtors must adequately protect PCA's secured position. PCA is undersecured since the evidence showed, at the time of filing, PCA had collateral valued at approximately $260,000 securing its $320,000 debt. The Debtors, in order to use cash collateral, must not protect PCA's $320,000 secured debt since PCA was undersecured. This would prefer PCA's undersecured claim over that of other unsecured creditors. Debtors must only adequately protect PCA's $260,000 secured claim. *In re Stein*, 19 B.R. 458 (Bktcy.E.D.Pa.1982).

What constitutes adequate protection under 11 U.S.C. § 363 is the same as what constitutes adequate protection under 11 U.S.C. § 362. However, due to the fact that the collateral is consumed or used up

in a § 363 context and the creditor's use is not merely delayed as in a § 362 context, the adequate protection standard is a strict one. *In re Berens*, 41 B.R. 524 (Bktcy. Minn.1984). It is the Debtor's burden to demonstrate that the secured party is adequately protected. *In the Matter of The Cropper Company, Inc.*, 35 B.R. 625 (Bktcy.M.D.Ga.1984); *In re Sheehan*, 38 B.R. 859 (Bktcy.S.D.1984).

As the cases reflect, adequate protection can be provided in many ways. One of the ways as set forth in 11 U.S.C. § 361(2) is through the grant of a replacement lien. This is a part of the adequate protection Debtors have proposed in this case.

The Debtors' offer of adequate protection puts PCA's debt in the following posture:

```
 $260,000 — secured portion of debt
 ($64,500) — principal reduction by cattle liq-
            uidation and grain liqui-
            dation.
 $195,500 — debt principal to be protected
($140,000) — equipment collateral
 ($31,950) — livestock collateral
  $13,550 — amount of PCA debt left unse-
            cured
```

■ Debtors have offered $20,000 to be paid to PCA as interest on PCA's debt. Since PCA is undersecured, it is not entitled to interest on its debt. 11 U.S.C. § 506(b). However, under the theory of the *American Mariner* case, PCA would be entitled to adequate protection of its lost opportunity costs. *Crocker National Bank v. American Mariner Industries, Inc.*, (*In re American Mariner Industries, Inc.*), 734 F.2d 426 (9th Cir.1984), *rev'g* 27 B.R. 1004 (9th Cir. BAP.1983). I assume that this is what Debtors' offer of interest represents—interest due and owing for the loss of use of the collateral and not interest on the actual loan from PCA to Debtors. These lost opportunity costs are the time value of the money which PCA is losing by being unable to reinvest the liquidated value of its collateral. This theory was adopted by the Federal District Court of this District in *Lend Lease v. Briggs Transportation Co., (In re Briggs Trans-*

*portation Co.)*, Case No. 3–84 CIV 224 (D.C.Minn. September 26, 1984). The case is on appeal to the Eighth Circuit Court of Appeals. I find that the Debtors' offer of $20,000, which is roughly a 10% return per annum on the $195,500 secured debt owed to PCA is a reasonable payment for lost opportunity costs and constitutes adequate protection.

To adequately protect PCA's debt, Debtors must protect not only the time value of the money but also the collateral value itself. To secure the debt left unsecured by Debtors' use of cash collateral, Debtors offer a second mortgage replacement lien on their nonexempt real estate to PCA. Debtors have equity in the real estate of approximately $36,000 if the real estate is valued at $150,000. I find the $150,000 value to be a reasonable one to use.

The PCA used appraisal testimony from a Federal Land Bank appraiser. His testimony established a value for the real estate in a range from $41,850 to $153,850 depending upon what portions of Debtors' property were claimed as exempt by Debtors. The portion the Debtors decided to claim as exempt does not "match up" completely with any one of the Federal Land Bank appraiser's appraisals. However, the parcel most similar to the land Debtors offer to give a replacement lien on is valued at $112,800. The Federal Land Bank appraiser valued the entire parcel (including the exempt 80 acres) at $153,850. Debtors' witness, Mr. Reimer, valued the nonexempt property at $180,000. However, he admitted that the land could not pay for itself at that price. He also stated that he did not check into whether being on the Red Rock Ridge affected sales prices. The Red Rock Ridge, where Debtors' property is located, has rock outcroppings which cause farming problems and affect drainage, thus lowering property values. Dale Polzin, one of the Debtors, valued the nonexempt real estate at $226,000. It is not clear what facts he based his opinion upon. I think a value of $150,000 is appropriate in light of the testimony given.

■ The adequate protection issue then becomes whether the $36,000 equity of Debtors in their nonexempt real estate is sufficient to adequately protect PCA. Since $36,000 exceeds $13,550, the present collateral value of PCA left unsecured by the Debtors' use of cash collateral is covered by the replacement lien.

However the analysis cannot end here. Debtors must also protect PCA against depreciation in value of the farmland and depreciation in value of the equipment.

There was conflicting testimony as to whether the farmland prices in the area were declining. Mr. Reimer, Debtors' appraiser, said that he had attended a seminar where a speaker stated prices had bottomed out. The Federal Land Bank appraiser talked as if land values were continuing to decline. I find that the evidence showed that farm property values are declining although the percentage of yearly depreciation was not established.

PCA presented evidence showing that the equipment in which it has a secured position depreciates at a rate of 10% per annum. No evidence contradicted this. Debtors plan to use the equipment in their farming operation this year, which use will cause depreciation.[2] Therefore, PCA will lose $14,000 in value on the machinery this year.

Of the $36,000 equity Debtors have in their nonexempt farmland, $27,500 is consumed in protecting actual principal sum and in equipment depreciation costs. This leaves a small equity of $8,450 in the real estate if declining farmland values are not considered.

PCA also argues that the second mortgage replacement lien is not adequate protection because the $8,450 equity cushion is no cushion at all when dealing with a second mortgage position in land. There was testimony offered that mortgagees such as the Federal Land Bank and PCA never agree to mortgage real property beyond a range of 55% to 80% of value. PCA uses 75% of value as loan value in most cases. Here, even if an 85% value is used, a mortgage in a maximum amount of $127,500 would be allowed. In that case, PCA is not adequately protected. If a 75% of value mortgage computation is used, only a $112,500 mortgage would be granted, which would mean no second mortgage would be appropriate at all.

The rationale behind a discounting of values when establishing the mortgage value of property is that a mortgagee wants a cushion to protect it against the vagaries of land values as well as to protect it in the event of foreclosure. Foreclosure costs include not only the direct costs of foreclosure, but also the redemption period costs. While the mortgagee waits for the redemption period to run, it must pay the costs of insurance and taxes and lose the time value of the money invested in the mortgage until a sale to a third party can be consummated. For a second mortgagee, all of the above problems exist, as well as the added problem of being a junior lienholder.

■ There are cases which state that an adequate protection offer must provide for the direct costs of foreclosure such as attorneys fees, filing fees, etc. *Federal Land Bank of Baltimore v. Toto, (In re Toto)*, 29 B.R. 947 (Bktcy.E.D.Pa.1983); *Vlahos v. Pitts (In re Pitts)*, 2 B.R. 476 (Bktcy.C.D.Cal.1979). This is reasonable particularly in a case such as this where a replacement lien is being granted and PCA did not expect to pay such costs based on its initial collateral. No evidence of these costs were provided but I find that they must be taken into account in determining

---

**2.** Technically, the equipment usage does not need to be protected under a cash collateral motion since it is not "cash collateral" which the Debtors will be using. Creditors need to bring a relief from stay request for protection of this type of property. However, since the equipment use is integrally related to the cash collateral use in this case and the issue was raised at the hearing, I will consider it as part of this motion. In order to arrive at the secured value of PCA's debt this depreciation should be considered.

whether adequate protection has been offered.

There is no case law which directly addresses the issue of whether an adequate protection offer should take into account a creditor's potential foreclosure costs—the time required to foreclose and the redemption period and the time value of money during those periods.[3] PCA will be giving up collateral—grain and cattle—which although likely to change in price are not subject to the costs associated with real estate liens. Repossession and sale of grain and cattle are swift. Values are clear due to known market prices for these commodities. Substituting land for this collateral is possible if the adequate protection takes into account the differences in the collateral. In this case, I do not feel that the small equity cushion of $8,450 takes into account the change from grain and cattle to real estate as collateral, the possible depreciating land values in the area, the costs of foreclosure, or the costs inherent in carrying the land through the redemption period in the event a foreclosure occurs. In other words, I find that in most cases, the value offered to a creditor to whom a replacement lien in real estate is being granted must be given sufficient value in the replacement lien to take into account the problems inherent in foreclosing upon and obtaining clear title to real estate. In this case $8,450 does not cover these costs.

For these reasons, I do not believe the adequate protection offer of Debtors is sufficient.

NOW, THEREFORE, IT IS ORDERED that:

1. The motion of the Debtors for use of cash collateral is denied.

---

3. An unreported Minnesota bankruptcy case, *In re Bagley*, BKY 4-84-2025 (M-1), (Bktcy.Minn. January 22, 1985), a copy of which is attached, considered the issue of whether the Federal Land Bank of St. Paul was adequately protected in a relief from the automatic stay motion in light of the approximately 18 month period needed by the Federal Land Bank to gain title to the debtors' real property free of debtors' redemption rights. The Court found that accruing interest and declining property values would, during the 18 month period, eventually totally erode any equity cushion existing in the property and therefore granted relief from the automatic stay. The Court looked only at accruing interest since the Federal Land Bank was oversecured and not at the "carrying costs" of the mortgage, i.e., the time value of money or direct foreclosure costs as I must in this case since PCA is undersecured.

## APPENDIX

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF MINNESOTA

In re: William D. Bagley and Gloria Bagley, Debtors.

BKY 4-84-2025 (M-1)

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TERMINATING STAY

At Minneapolis, Minnesota, January 22, 1985.

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for hearing on January 11, 1985, on the motion of Federal Land Bank of Saint Paul and Federal Land Bank Association of Saint Cloud ("Federal Land Bank") for an Order terminating the automatic stay so as to enable Federal Land Bank to commence foreclosure proceedings.

Federal Land Bank appeared through its counsel, John C. Thomas of the law firm of Oppenheimer, Wolff, Foster, Shepard and Donnelly. Debtors appeared through their counsel, Allan J. Beckel of the law firm of Willenbring, Lickteig & Dahl.

The Court, being fully advised of the premises, after reviewing the pleadings herein and upon the argument of counsel and the testimony of witnesses, hereby makes the following:

### FINDINGS OF FACT

1. The debtors, William D. and Gloria Bagley, filed their petition under Chapter 11 on November 16, 1984 after a previous Chapter 13 case (BKY 4-84-1151) filed in

July of 1984 was dismissed on October 24, 1984, pursuant to 11 U.S.C. § 109(e).

2. Federal Land Bank holds a first mortgage ("Mortgage") lien on 360 acres of the debtors' farm property located in Stearns County, Minnesota.

3. The Mortgage dated June 22, 1982 was granted by the debtors to the Federal Land Bank to secure a promissory note of the same date in the original principal amount of $200,000.00.

4. Obligations owed by the debtors to the Bank as of January 11, 1985 are in the amount of $240,004.08, consisting of $217,-456.64 principal, plus accrued interest and charges, including tax and insurance advances, in the amount of $22,547.40. Interest accrues at a variable rate, currently 13¼%, and a per diem rate, currently $88.16 per day.

5. Debtors have made no payments on the obligation due Federal Land Bank since July of 1983.

6. The Mortgage requires debtors to pay all real estate taxes which debtors have failed to do, such taxes having been advanced by Federal Land Bank.

7. The value of the debtors' land will depreciate 10% in the next year.

8. The value of the debtors' farm property is $314,000.00.

9. If the automatic stay were terminated, it would be approximately 18 months before the Federal Land Bank gained title to the property mortgaged free of the debtors' equity of redemption.

10. The debtors project farm income of $81,290.00 for 1985, with farm expenses of $25,000.00.

11. The Federal Land Bank's interest in the debtors' property is not adequately protected.

## CONCLUSIONS OF LAW

The Federal Land Bank's motion is made pursuant to 11 U.S.C. § 362(d). It is re-questing that the stay be terminated for various reasons, primarily since it feels that it lacks adequate protection of its interest in the debtors' property. Since the Federal Land Bank is currently oversecured, its interest in the debtors' property is equal to its debt of approximately $240,-000.00. 11 U.S.C. § 506(a). Also because it is oversecured, its debt and therefore its interest in the debtors' property increases with the accrual of interest. See, 11 U.S.C. § 506(b). To the extent that the Federal Land Bank will have to continue to advance real estate taxes and insurance premiums, its debt will increase even further.

Because of the various notice requirements of Minnesota statutes and the one year redemption period allowed to the debtors, it will be approximately 18 months to terminate the debtors' interest in the property which is the subject of the mortgage. During that period of time the debt of the bank will increase approximately $48,-000.00 and the mortgaged property will decrease in value approximately $54,000.00. Since the equity cushion, or the difference between the debt and the value is only $74,000.00, it is obvious that at some point during this process the Bank's debt will catch up to the value of the land. Therefore if the process of foreclosure commences immediately, the Bank will not recover its total debt and the longer the stay remains in effect, the worse the shortfall will become.

The debtors have offered nothing as adequate protection other than apparently the existing equity in the property which as we have seen is not adequate.[1] Therefore I conclude that the Federal Land Bank is not adequately protected and it is therefore entitled to have the automatic stay terminated.

THEREFORE, IT IS ORDERED:

The automatic stay provided in 11 U.S.C. § 362(a) is terminated insofar that it would prevent the Federal Land Bank of Saint

---

**1.** The debtors apparently have little to offer as they will net only $56,000.00 from this year's farm operations if everything goes as projected. Even paying that whole amount to the Federal Land Bank would not adequately protect the Federal Land Bank.

Paul and the Federal Land Bank Association of Saint Cloud from foreclosing pursuant to Minnesota law its mortgage interest in the debtors' real property.