**In re O.P. HELD, INC., Debtor.**

**Bankruptcy No. 87–00337.**

United States Bankruptcy Court,
N.D. New York.

May 27, 1987.

Penberthy, Kelly & Walthall, P.C., Utica, N.Y., for Bank of Utica; William W. Kelly, of counsel.

Vincent R. Corrou, Utica, N.Y., for debtor.

Bond, Schoeneck & King, Syracuse, N.Y., for Otto P. Held; Robert K. Weiler, of counsel.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y., for Syracuse Supply Leasing Corp.; Peter L. Hubbard, of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The Court has before it for consideration the motion of the Bank of Utica ("Bank") seeking relief from the automatic stay imposed pursuant to § 362 of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code").

### FINDINGS OF FACT

On March 13, 1987, O.P. Held, Inc. ("Debtor") filed a voluntary petition pursuant to Chapter 11 of the Code.

On March 24, 1987, the Court signed an Order to Show Cause on behalf of the Bank directing the Debtor to appear before the Court on March 27, 1987, and show cause why it should not be directed to a) segregate and account for all cash collateral; b) refrain from the use, sale, lease or other disposition of property subject to Bank's security interest; c) provide adequate protection to the Bank; or d) failing to provide adequate protection, allow Bank to modify the automatic stay and seize its collateral. In addition, the Court granted a temporary restraining Order prohibiting Debtor from the use, sale or disposition of the Bank's collateral pending the hearing.

On March 27, 1987, counsel for the Bank and Debtor appeared, and agreed to adjourn the motion for the purpose of holding an evidentiary hearing on April 3, 1987.

The Debtor also submitted an Answering Affidavit disputing the amount due, alleging misconduct and bad faith on the part of the Bank and another secured creditor, Syracuse Supply Leasing Company ("Syracuse Supply"), and further requesting a hearing as to the amount due the Bank and the value of the Bank's collateral owned not only by the Debtor, but by the Debtor's individual officers as well.

The April 3rd hearing was thereafter adjourned to April 8, 1987, at which time the Bank offered the testimony of Matthew Barile ("Barile"), its Vice-president. Barile's testimony established the existence of three separate loans due and owing the Bank from the Debtor. As of March 12, 1987, the total indebtedness was $766,-631.90. Barile stated that the Bank held a perfected security interest in all of the Debtor's machinery, furniture, fixtures, inventory, and accounts receivable, securing the outstanding debt, subject only to the rights of Syracuse Supply and Otto P. Held ("Held") in certain items of Debtor's machinery.

Prior to the conclusion of the hearing, the Bank and Debtor, through their respective counsel, agreed to enter into a stipulated order whereby Debtor was to provide the Bank with information as to the value of its assets, the location, identification, and segregation of cash collateral, and its proposal of adequate protection for the continued use of cash collateral. This Order was entered on April 8, 1987, directing the Debtor to provide and file with the Court, on or before April 13, 1987, the requested information, together with a proposal for adequate protection of the Bank's collateral.

On April 13, 1987, the Debtor filed and presumably served upon the Bank, three separate documents, a "Report", a "Proposal" (neither of which were signed by the Debtor), and a loose-leaf folder containing written material designated as Exhibits 3 through 8.

By Order to Show Cause dated April 20, 1987, the Bank sought an order pursuant to Code § 362, permitting it to seize and sell all of its collateral, upon the grounds the Debtor had failed to comply with the consent Order dated April 8, 1987. The motion was heard on April 27, 1987, and Debtor again interposed an Affidavit in opposition. Neither party requested any further evidentiary hearing, and the motion was submitted for decision on April 27, 1987.

The Order of April 8, 1987, ("adequate protection Order"), directed the Debtor to perform certain tasks, produce documentary information and submit an acceptable proposal for adequate protection, which the Bank contends Debtor has failed to do. Paragraphs 1 and 2 of the adequate protection Order generally directed the Debtor to segregate and account for the Bank's cash collateral.

In response, Debtor, in paragraph 1 and 2 of its "Report", states simply that it has segregated and accounted for all cash collateral by opening an account at the Rome Savings Bank and that it has not utilized "any of the collateral except items manufactured which have resulted in an increase in the accounts receivable."

The "Report" does not contain an accounting or bank statement, or any other document which would inform the Bank as to the past or present status of its cash collateral. Certainly, the Report fails to account for the Debtor's collection or use of cash collateral since the date of filing.

When queried at the April 27, 1987 hearing, Debtor's counsel advised the Court that since the cash collateral account at the Rome Savings Bank had only been open a few weeks, no bank statement was available.

Paragraph 3 of the adequate protection Order directed Debtor to provide the Bank with a list of its accounts receivable on the date the petition was filed, "aged to show collectability along with a listing of all accounts receivables subsequently collected and the present location of the money collected." In response, Debtor submitted "Exhibit 3", which purports to be a list of all accounts receivable billed from 3/13 to 4/13, totaling $56,462.47, identified by invoice number. Additionally, Debtor provided two computer printouts entitled "Accounts Receivable Detail Aging Report",

dated 3/16/87 ($140,847.19) and 4/13/87 ($154,073.44), respectively.

Again, the information provided to the Bank is incomplete, for while Debtor has provided a list of its accounts receivable generated between 3/13 and 4/13 (presumably 1987), together with the apparent age of the various uncollected accounts existing on Debtor's books as of 3/16/87 and 4/13/87, it is difficult, if not impossible, for the Bank to determine which accounts may have been collected subsequent to the date of the filing of Debtor's petition. Nor does Exhibit 3 indicate the present location of account receivable proceeds, although presumably they are, or were, on deposit in the account at Rome Savings Bank.

Debtor's Exhibit 4 purports to be a compilation of all income received during the period 3/13 through 4/13 (again presumably 1987), together with a similar compilation of all checks written during this time. Exhibit 4 apparently provides a portion of the information omitted from Exhibit 3, since it presumably represents all the accounts receivable actually collected by Debtor during the month following the filing of the petition.

The Bank objects to the list of checks in Exhibit 4 designated only as "Payroll", as the name of each payee is omitted. Further, the individual amount of some 57 payroll checks is not disclosed. With the exception of payroll checks numbered 351 to 365, for which no amounts are reflected, the remaining checks are identified only by a total amount for each group of approximately 15 checks.

The Bank correctly contends that Exhibit 4 fails to reveal the actual compensation being paid by Debtor to its officers, Gerald O. Williams and Lorraine J. Williams (collectively "Williams"). While this latter concern is warranted, the Court believes the Debtor has, with the exception of the payroll checks, generally complied with the provision of the adequate protection Order requiring a list of all receipts and disbursements incurred since the filing.

Debtor's Exhibit 5 purports to comply with the requirement of the adequate protection Order to provide "a detailed and duly authenticated listing of all equipment, machinery, tooling, furniture, and fixtures which were on hand on the petition date, together with a listing of those disposed of since debtor's filing of petition in this matter." The Bank objects to Exhibit 5, contending it is not authenticated as of the petition date, and further does not reflect what items, if any, have been disposed of since the petition date.

While it is true that Exhibit 5 does not indicate the date on which it is deemed accurate nor does it list any items which may have been disposed of since the filing, paragraph 2 of Debtor's "Proposal" does state that "No items of property, machinery or equipment have been removed from the premises except for those items delivered to customers as an on-going business which have been converted to accounts receivable."

Paragraphs 6 and 7 of the adequate protection Order direct Debtor to provide a list of all inventory and work in progress on the petition date, together with a similar list of all inventory purchased or consumed along with work in progress completed since the petition date.

Exhibit 6 and 7 submitted by Debtor contain a two page computer printout including 1) five types of "tool" inventory with an estimated value of $246,672.89; 2) a compilation of "finished parts" designated by part number and having a total value of $50,190.68; and 3) photocopies of three additional hand written pages which itemize quantities of raw materials such as brass, hex steel, bronze, copper, and something designated as "mach" together with corresponding values.

As with Exhibit 5, Exhibits 6 and 7 are not authenticated, and there is no indication of what time period is applicable to the inventory reflected, other than Debtor's blanket statement in paragraph 2 of the "Proposal".

Paragraph 8 of the adequate protection Order required Debtor to submit a detailed list of all orders in hand divided by customer and product. In response, Debtor has provided Exhibit 8 containing four pages of

computer printouts, and two hand written photocopied pages. These documents appear to reflect the names of various customers, together with a log and part number, quantity, delivery date, and information regarding pricing structure. As pointed out by the Bank, Exhibit 8 appears to reflect customer orders during the period May through December 1986, with only one order for 1987, that received on 1/6/87.

Debtor offers no explanation as to the apparent lack of customer orders in 1987.

Finally, the adequate protection Order directed the Debtor to file a "pro forma operating statement, such statement to be equal in duration to the time debtor-in-possession proposes to use the Bank's collateral". Debtor indicated it could not produce such a statement for its fiscal year ended in July; however, Debtor did not believe it had sustained a loss in the current fiscal year, as its gross sales amounted to $622,946.09, with expenses and cost of goods sold amounting to $586,000.00.

In response to the Court's directive that it outline a plan for adequate protection, Debtor filed its unsigned "Proposal". Simply stated, the Proposal requires the Bank to collect all of Debtor's accounts receivable. Each Friday, Debtor will submit a "budget" request to the Bank for a sum sufficient to meet its payroll, inventory purchases, rent, and equipment rental and taxes. On the following Wednesday, after the Bank's review of the budget, and consultation, Debtor will be permitted to draw the agreed upon budget amount from the accounts receivable then on deposit with the Bank. The remaining balance in the account will be applied by the Bank to Debtor's outstanding secured obligations to the Bank.

As a final component of the "Proposal", Debtor intends to divert to the Bank the rental payments it presently makes to its corporate officers as the owners of Debtor's manufacturing facilities located on Lansing and Rutger Streets, Utica, New York.

The Bank rejects the "Proposal" upon the grounds that it does not fix the amount the Bank will actually receive for the Debtor's continued use of its cash collateral, and it authorizes the Debtor to pay other "debtors" [sic] i.e. IRS, equipment rental and general rent ahead of the Bank. Additionally, the Bank notes that Debtor's diversion of rent is meaningless, since the Bank was in the process of foreclosing its mortgage on those properties. Although the foreclosure action is presently stayed, a state court receiver was appointed pre-petition to collect the rent normally paid by Debtor to its landlords.

Finally, the Court notes the adequate protection Order granted the Bank a post-petition security interest in all collateral in which the Bank had a security interest pre-petition.

## CONCLUSIONS OF LAW

The following is promulgated pursuant to Fed.R.Bankr.P. 7052 and 9014.

The adequate protection Order was intended to accomplish two objectives. First, the Order was to provide the Bank and the Court with sufficient data regarding the Debtor's operations, to assure the Bank that its secured position was not being seriously eroded as the result of Debtor's continued post-petition use of the Bank's cash and non-cash collateral. Second, the Debtor was given time to formulate a proposal to provide the Bank with adequate protection so as to induce the Bank to permit the continued use of collateral during reorganization efforts.

■ With regard to the first objective, the Court agrees with the Bank's contention "that Debtor has so casually prepared this report that it either does not know or does not care that the information submitted is apparently largely either irrelevant, incomprehensible, unprocessed, unorganized or unresponsive."

The Debtor's inability or refusal to provide adequate information of its segregation and accounting for the use of cash collateral, violates not only of the terms of the adequate protection Order, but contravenes the clear requirement of Code § 363(c)(4).

Debtor's failure to itemize the payroll checks by payee and amount raises the inference, perhaps unnecessarily, that the corporate officers are being paid excessive amounts of compensation, utilizing the Bank's cash collateral.

In general, as the Bank has accurately observed, the Debtor's presentation of the required information in an "incomprehensible", "unprocessed" and "unorganized" manner does not portray Debtor as one genuinely interested in a reorganization which must, of necessity, include the cooperation of the Bank. By virtue of the consent of the parties to the adequate protection Order of April 8, 1987, there can be no question that the Bank is entitled to adequate protection, and thus the Court need not concern itself with whether or not the Bank, as a secured lender, has met the burden of proof imposed by Code §§ 362(g)(1) and 363(o)(2) and is, therefore, entitled to adequate protection referred to in Code §§ 362(d), 363(e). The issue is simply whether or not the protection proposed by Debtor is adequate.

■ Code § 361 suggests several forms of adequate protection, yet that section has been consistently interpreted as not containing an exclusive list of such forms. *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir.1984); *In re Digby*, 47 B.R. 614, 623 (Bankr.N.D.Ala.1985). Thus the Debtor, with or without the consent of its secured lender, may propose other forms of adequate protection.

■ It is essential only that the secured lender be assured of the maintenance and thus recoverability of its lien value in the interim period between the date of filing and the confirmation of the plan of reorganization. *See Martin v. United States (In re Martin)*, 761 F.2d 472 (8th Cir.1985); *In re Island Helicopter Corp.*, 63 B.R. 515 (Bankr.E.D.N.Y.1986); *First Agricultural Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires)*, 46 B.R. 892 (Bankr.D.Mass.1985); *Aegean Fare, Inc. v. Massachusetts (In re Aegean Fare, Inc.)*, 34 B.R. 965 (Bankr.D.Mass.1983).

■ Unquestionably, the burden is on the Debtor to establish adequate protection, and what constitutes adequate protection turns upon the facts of the particular case. *See In re Martin supra; Paquette v. Production Credit Asso. (In re Paquette)*, 41 B.R. 42 (Bankr.D.Minn.1984); *In re Air Vermont, Inc.*, 39 B.R. 684 (Bankr.D.Vt.1984); *Matter of Cropper Co., Inc.*, 35 B.R. 625 (Bankr.M.D.Ga.1983).

One of the most common, yet non-statutory, methods of providing adequate protection is to establish a so-called "equity cushion" wherein the debtor is able to show, through competent appraisal testimony, that the collateral has a present value substantially in excess of the balance due on the allowed secured debt, and that the collateral is not rapidly depreciating in value. *See City National Bank v. San Clemente Estates (In re San Clemente Estates)*, 5 B.R. 605 (Bankr.S.D.Cal.1980).

Some courts have suggested that what may constitute adequate protection for purposes of addressing a motion to lift stay pursuant to Code § 362, is not necessarily adequate to authorize a debtor's use of cash collateral, as the latter may be rapidly dissipated. *See In re Polzin*, 49 B.R. 370 (Bankr.D.Minn.1985); *In re Epstein*, 26 B.R. 354 (Bankr.E.D.Tenn.1982); *Sun Bank v. Earth Lite, Inc. (In re Earth Lite, Inc.)*, 9 B.R. 440 (Bankr.M.D.Fla.1981); *Matter of Mickler*, 9 B.R. 121 (Bankr.M.D. Fla.1981).

■ In the instant case, there is no competent proof of asset valuation tending to establish an equity cushion in non-cash collateral, nor does the "Proposal" submitted by Debtor suggest that such equity cushion exists. No appraisals were ever submitted to the Court, and no appraisal testimony was ever offered in support of the alleged values.

Both parties have overlooked proof of the potential equity in the collateral owned by Williams, which is apparently subject to the Bank's mortgage as security for the Debtor's obligations. Equity in such collateral has been considered by some courts in arriving at adequate protection. *See In re Earth Lite, Inc. supra; In re Mary Harp-*

*ley Builder, Inc.,* 44 B.R. 151 (Bankr.N.D. Ohio 1984); *Roe Excavating, Inc. v. Thorp. Discount, Inc. (In re Roe Excavating, Inc.),* 52 B.R. 439 (Bankr.S.D.Ohio 1984).

Debtor has alleged in its Answering Affidavit filed on March 27, 1987 the value of its "machinery" and "materials" to be between $400,000.00 and $700,000.00 if sold on Debtor's premises. Debtor referenced an auctioneer's appraisal, but an appraisal was not specifically identified, nor was any copy attached.

In addition, a portion of Debtor's Exhibit 3 is a computer printout which purports to be Debtor's "Accounts Receivable Detail Aging Report" reflecting total accounts receivable as of 4/13/87 of $154,073.44.

Conversely, the Bank, relying in part on reports it alleges were submitted to it by Debtor, fixes the value of its collateral in the Application filed with the Court on March 24, 1987, as follows:

*Accounts Receivable:* $150,625.03 (as of November 21, 1986).

*Inventory & Tooling:* $57,563.80 (later corrected by affidavit of Barile filed March 27, 1987 to reflect $242,758.00 as of November 14, 1986).

*Machinery:* $50,000 plus an additional $147,000 which may be subject to a conflicting security interest of Otto P. Held.

The Bank arrives at a total collateral value of $590,383.03, portraying it as substantially undersecured as of the date of the Debtor's filing, at least as compared to collateral owned by the Debtor.

 It is apparent that Debtor seeks to employ the periodic payment concept outlined in Code § 361(1), together with a post-petition or "roll-over" lien in all of the same collateral to which the Bank's pre-petition lien attached.

Debtor has proposed that the Bank receive all of its accounts receivable less a specific weekly budgeted amount with which the Debtor will maintain the day to day operation of its business. The Debtor's Proposal does not clearly indicate any estimated figures with which the Bank or the Court can make any real evaluation of the adequacy of the periodic payment.

Presumably, the contention is that if one reviews Exhibit 4, they might conclude that in the monthly period 3/13/87 to 4/13/87, Debtor had receivable income of $48,002.20, against disbursements of $22,203.93. Thus, the Bank would have received approximately $26,000.00 in that month to be applied to its outstanding debt.

Unfortunately, this one month of operation, taken out of context, following on the heels of a Chapter 11 filing, and without any annualizing and normalizing of income and expenses, is not the type of projection a prudent businessman or banker is willing to act upon. The deficiency is all the more apparent when the figures provided by Debtor for the period 3/13/87 to 4/13/87, are compared with the figures reflected in paragraph 20 and Exhibit D of the Bank's Application filed with the Court on March 24, 1987.

In paragraph 20, the Bank alleges (without dispute from Debtor), that in response to an order obtained from a state court in February of 1987, Debtor submitted a purported accounting for the period December 26, 1986 through apparently February 3, 1987, reflecting $98,340.84 in collected accounts receivables and $86,664.43 in disbursements.

Certainly, the pro-forma operating statement required by the adequate protection Order would have gone a long way toward giving both parties, as well as the Court, a better grasp of what would truly constitute adequate protection. The Court is unable to accept Debtor's contention that a projection of future operating cost is unavailable because it has not completed its current fiscal year.

It appears that the Proposal presently submitted by the Debtor would be very similar to the arrangement which existed between the parties during most of 1986. On December 26, 1986, the Debtor terminated that arrangement because it alleged the Bank reneged on its commitment to honor Debtor's payroll checks (See paragraph 7 of Debtor's Answering Affidavit filed March 27, 1987). While not disputing Debtor's allegations, the Bank, at para-

graph 15 of its Application filed March 24, 1987, alleges the payments being received pursuant to the arrangement "were not sufficient to cure the defaults which existed."

Without the availability of actual projections based on past experience, the Debtor's proposal falls far short of adequate protection; it is nothing more than an agreement to agree in the future, and the Court suspects the fatal flaws which resulted in the termination of the arrangement between the parties in December 1986, will again make themselves evident if the Debtor's current proposal is implemented.

■ As Debtor advanced what the Court must conclude is an unacceptable proposal, it is not the function of the Court to attempt to re-work Debtor's Proposal to an acceptable form; in this case, the Court would not even have data sufficient to embark on such an effort. *See Levin v. Kedzie-Carrol Currency Exchange, Inc. (In re Cash Currency Exchange, Inc.)*, 52 B.R. 577, 581 (Bankr.N.D.Ill.1985); *American Security Bank, N.A. v. Robson (In re Robson)*, 10 B.R. 362, 365 (Bankr.N.D.Ala.1981).

■ While the Court is a court of equity which seeks to rehabilitate and reorganize the financially ailing debtor, it cannot ignore the rights of secured creditors. *See M Bank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1398 (10th Cir.1987); *Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)*, 734 F.2d 426 (9th Cir.1984); *In re Certified Corp.*, 51 B.R. 768 (Bankr.D.Hawaii 1985). Adequate protection can only be determined if the Debtor is willing to cooperate with its secured creditor, providing sufficient, accurate information upon which both the creditor and the Court can make an informed decision. While the Court recognizes that the parties appear before it in an adversarial posture resulting from pre and post petition events, that does not justify the withholding of necessary information with which adequate protection can be fashioned. As Bankruptcy Judge Trabue concluded in *Northern Trust Co. v. Leavell (In re Leavell)*, 56 B.R. 11, 13 (Bankr.S.D. Ill.1985) "When requesting Court authorization for expenditure of cash collateral, a debtor must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case."

The Court must conclude that for whatever the reason, the Debtor here has not cooperated with either the Court or the Bank in providing sufficient data, even though required by statute, and consented to by way of Court Order. The Bank's first application to the Court was made on March 24, 1987, and yet after almost two months of alleged ongoing negotiations between the parties, nothing has been resolved.

Upon a review of the Court's adequate protection Order, the Report (with Exhibits), and Proposal submitted by Debtor, the Court holds that Debtor has not complied with the requirement of that Order, and the Court, therefore, grants to the Bank the relief provided for therein.

IT IS SO ORDERED.